IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| DAN HAENDEL, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:18-cv-00289 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| VIRGINIA DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | By:   Joel C. Hoppe |
|     Defendants. | ) | United States Magistrate Judge |

Plaintiff Dan Haendel, a former Virginia inmate appearing *pro se*,[1] filed this action under

42 U.S.C. § 1983, alleging that several correctional officials violated his rights under the First

and Fourteenth Amendments to the United States Constitution. Am. Compl. 1–2, ECF No. 31-1.[2]

The case is before me by the parties' consent under 28 U.S.C. § 636(c). ECF No. 47. Several

claims and defendants were previously dismissed from this action. *See* Order (June 6, 2019),

ECF No. 46; Mem. Op. (Sept. 24, 2019), ECF No. 55. The remaining nine Defendants[3] now seek

summary judgment on Plaintiff's remaining claims, ECF No. 62, and their motion has been fully

briefed, ECF No. 63, 67. The motion will be GRANTED in part and DENIED in part.

---

[1] Plaintiff is an attorney appearing *pro se*. Like the prior presiding judge, "I decline to extend the liberal construction standard to an attorney" who is representing himself. Mem. Op. 1 n.1 (Sept. 13, 2018), ECF No. 20.

[2] Plaintiff's amended complaint, ECF No. 31-1, is the operative complaint in this case. *See* Order, ECF No. 37. The amended complaint is a verified complaint, *see* Am. Compl. 21, and it refers to exhibits attached to Plaintiff's original verified complaint, *see* Compl. 30–119, ECF No. 1-1. Because a verified complaint is "the equivalent of an opposing affidavit for summary judgment purposes," *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co., Ltd.*, 783 F.3d 507, 516 (4th Cir. 2015), I consider both Plaintiff's amended complaint and any admissible portions of the exhibits to his original complaint as evidence for purposes of this motion, *see Kennedy v. Joy Techs.*, 269 F. App'x 302, 308 (4th Cir. 2008) (citing *Md. Hwy. Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)).

[3] Those Defendants are Warden Ivan Gilmore, Institutional Program Manager Douglas Gourdine, Chief of Housing Walker, Unit Manager Anita Long, Food Services Manager Martin, Sergeant Sacra, Counselor Feeley, Investigator Butler, and Correctional Officer Walters. Defs.' Br. in Supp. 1, ECF No. 63; Am. Compl. 1 (listing Defendants' professional titles). The Virginia Department of Corrections and two other individual defendants were dismissed from this action without prejudice in June 2019. *See* Order, ECF No. 46.

## I. Standard of Review

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility" of demonstrating the "absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met this burden, the nonmoving party must then "set forth specific facts" showing there exists a genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In doing so, the nonmoving party "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). It must support its position with admissible evidence, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see Kennedy*, 269 F. App'x at 308 (citing *Md. Hwy. Contractors*, 933 F.2d at 1251).

The "mere existence of *some* alleged factual dispute between the parties" is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247–48. The disputed fact must be material, such that it "might affect the outcome of the suit" under the applicable substantive law. *Id.* at 248. And the dispute must be "genuine," such that a reasonable jury could find in favor of the nonmoving party. *Id.* Finally, on a motion for summary judgment, the court does not assess the credibility of the parties or otherwise weigh the evidence. Instead, "all disputed facts and reasonable inferences are viewed in the light most favorable to the" nonmoving party. *Campbell v. Florian*, 972 F.3d 385, 392 (4th Cir. 2020).

## II. Background

Plaintiff was incarcerated in the custody of the Virginia Department of Corrections ("VDOC") at Coffeewood Correctional Center ("Coffeewood") from September 2015 through September 13, 2018. Am. Compl. 2. He is a member of the Jewish faith and observes kosher dietary requirements. *Id.* His claims, on which Defendants now seek summary judgment, allege (1) religious discrimination in violation of the First Amendment, (2) retaliation in violation of the First Amendment, and (3) due process violations in violation of the Fourteenth Amendment.[4] *See generally* Am. Compl. 18–20; Defs.' Br. in Supp. 12–23. Plaintiff sued each remaining Defendant in his/her individual and official capacities. Am. Compl. 1.

On August 12, 2017, Defendant Sacra charged Plaintiff with a disciplinary violation for throwing bread to a bird. Compl. Ex. A (II), ECF No. 1-1, at 3.[5] Plaintiff contested the charge, filing an informal complaint, a regular grievance, and repeated disciplinary appeals regarding the incident. *See* Compl. Ex. E, ECF No. 1-1, at 59, 61; Compl. Ex. A (II), at 5, 8–9, 11. He asserted that Sacra had charged him in retaliation for a complaint Plaintiff had made against Sacra on April 27, 2017, regarding the use of a stapler.[6] Then, on October 14, 2017, Defendant Walters charged Plaintiff with possessing two sugar and two mustard packets that he allegedly received from another inmate in violation of prison policy. Compl. Ex. A (III), ECF No. 1-1, at 13. On the same day, Walters also charged Plaintiff with a violation for using vulgar language, alleging that Plaintiff swore at Walters and "used his right middle finger to display the bird" in Walters's direction. Compl. Ex. A (IV), ECF No. 1-1, at 23. In response, Plaintiff lodged complaints

---

[4] This factual background focuses solely on facts relevant to Plaintiff's remaining claims.

[5] Pinpoint citations to documents filed electronically in this Court use the header page numbers generated by CM/ECF and the exhibit labels assigned by the filing party.

[6] *See, e.g.*, Compl. Ex. A (II), at 11 ("Sacra's charge emanates from and is retaliation for my informal complaint of his denying my request to use a stapler."). Plaintiff filed an Informal Complaint against Sacra, regarding the use of a stapler, on April 27, 2017. Compl. Ex. E (II), ECF No. 1-1, at 65 (explaining that Plaintiff wanted to use a stapler to prepare a court filing and that Sacra ordered him to return to his building before he could do so).

against Walters, alleging that Walters charged him with the violations solely to discriminate and retaliate against him. *See, e.g.*, Compl. Ex. E (III), ECF No. 1-1, at 62, 64. Plaintiff also filed disciplinary appeals. *See, e.g.*, Compl. Ex. A (III), at 22; Compl. Ex. A (IV), at 31–32. Plaintiff maintains that the conduct cited in all three charges did not amount to a violation of prison policy because it was "so petty," Am. Compl. 6, or the prison policy was not regularly enforced, *id.*, and that Defendants Sacra and Walters had retaliatory and discriminatory motives for charging him. *See* Am. Compl. 5–7.

Around the same time, Plaintiff filed multiple complaints alleging that prison officials failed to announce services for the Jewish holidays of Rosh Hashanah and Yom Kippur. Compl. Ex. G, ECF No. 1-1, at 79, 81, 83–84 ("It seems that the Jewish High Holidays–Rosh Hashanah (New Year) and Yom Kippur (Day of Atonement)–have been passed over, at least at Coffeewood[.]"). He claimed that officials either failed to post signs announcing religious services altogether or posted signs after the holidays had already passed. *Id.* Prison officials denied these allegations. Compl. Ex. G, at 86. They responded by asserting that they did, in fact, post signs announcing services for the Jewish holidays. *Id.*

In February 2018, prison officials conducted an annual review of Plaintiff's Good Time Class Level. Defs.' Br. in Supp. Ex. C, ECF No. 63-1, at 31–32. Pursuant to Operating Procedures 830.3 and 820.3, VDOC inmates can receive up to 4.5 days of earned sentence credit per 30 days served. Defs.' Br. in Supp. Ex. A, ECF No. 63-1, at 6. During an annual review, prison officials give an inmate a score based on his performance over the prior twelve-month period, awarding and deducting points for disciplinary infractions incurred, educational/vocational goals completed, and work performed.[7] *Id.* at 9. An inmate's score

---

[7] Inmates can receive up to 100 points. Defs.' Br. in Supp. Ex. A, at 9. In the "infractions" category, 40 points are available. *Id.* Inmates with no disciplinary violations receive the full 40 points. *Id.* Other

dictates his Good Time Class Level. *Id.* at 10. Inmates who receive 85 to 100 points fall into Class Level I, in which they earn the full 4.5 days of earned sentence credit per 30 days served. *Id.* Inmates who receive fewer points fall into Class Level II, III, or IV, in which they gain earned sentence credit at slower rates.[8] *Id.* Prison officials also have discretion to override the results of an inmate's annual review in certain circumstances. *Id.* at 10–11.

On February 16, 2018, Plaintiff met with Counselor Bracey[9] for an annual review. Defs.' Br. in Supp. Ex. C, at 32; Compl. Ex. C (II), ECF No. 1-1, at 47. Bracey noted that in the prior year, Plaintiff had incurred the three disciplinary violations, had worked as a tutor, and had completed one educational program. Defs.' Br. in Supp. Ex. C, at 32. She thus provided the following recommendation for Plaintiff's Good Time Class Level: "C/L-3 scoring 50 points with a recommendation for C/L-2 due to #1 override for points scored being very low and offender stating his current charges under conviction are currently being appealed." *Id.* Subsequently, on March 8, 2018, Unit Manager Anita Long held an Institutional Classification Authority ("ICA") Hearing. *Id.* Long determined that Plaintiff scored 70 points and should be moved to Class Level II. *Id.*

On March 13, 2018, Defendant Walker affirmed Long's finding. *Id.* at 31. In the disciplinary infractions category, Plaintiff received 10 points. *Id.* Although he could have

---

inmates start with 40 points and have points deducted from their scores for disciplinary violations. *Id.* For example, an inmate who committed one Category II offense within the past year will get 10 points deducted from his score. *Id.* In the "reentry plan, annual goals" category, up to 40 points are available. *Id.* In this category, inmates start with 0 points and have points added to their scores for the completion of educational, vocational, or other programs. *Id.* In the "work" category, inmates start with 0 points and have points added to their scores for work performed in the previous year. *Id.*

[8] Inmates eligible for Earned Sentence Credits earn good time at the following rates: Class Level I (85 to 100 points)–4.5 days earned per 30 days served; Class Level II (65 to 84 points)–3 days earned per 30 days served; Class Level III (45 to 64 points)–1.5 days earned per 30 days served; Class Level IV (44 points or below)–0 days earned per 30 days served. Defs.' Br. in Supp. Ex. A, at 10, 16.

[9] Counselor Bracey is no longer a defendant in this action. *See* Order, ECF No. 46.

received up to 40 points in this category, Walker deducted 10 points for each of the three disciplinary violations imposed by Defendants Sacra and Walters. *Id.* In the remaining categories, Plaintiff received the maximum possible number of points–40 points in the second category for completion of two educational programs and 20 points in the third category for working as a tutor. *Id.* Altogether, Plaintiff's scores in the three categories totaled 70, which moved Plaintiff from Class Level I, where he had been earning 4.5 days of earned sentence credit per 30 days served, to Class Level II, *id.*, where he would earn only 3 days of earned sentence credit per 30 days served, *id.* at 4, 16. In total, this changed lengthened Plaintiff's sentence by nine days. Defs.' Resp. to Mot. for Emergency Immediate Inj. Relief, Aff. of D. Shiflett ¶¶ 5–6 (Aug. 29, 2018), ECF No. 12-1, at 2. Plaintiff was now projected to be released on September 13, 2018, instead of September 4, 2018. *Id.*; *compare* Compl., Ex. B (II), at 42, *with* Defs.' Br. in Supp. Ex. C, at 31. Importantly, this change meant that Plaintiff would be in prison during Jewish New Year, which occurred on September 9–11, 2018. *See* Compl. Ex. H (I), ECF No. 1-1, at 88. Upset by this, Plaintiff also appealed the class level change, filing multiple grievances and disciplinary appeals. *See, e.g.*, *id.*; Compl. Ex. C (I), at 44, 46; Compl. Ex. C (II), at 49; Compl. Ex. C (IV), ECF No. 1-1, at 55. In particular, he argued that Counselor Bracey had recommended that he receive a score override, that Defendant Walker had not granted the override, and that he should be returned to Good Time Class Level I. *See, e.g.*, Compl. Ex. C (II), at 47 (Plaintiff's grievance alleges: "The correct raw score–even assuming there is no issue as to underlying 3 charges–is 70 which with the #1 override that Bracey invokes is C/L1").

In May 2018, Plaintiff again complained that prison officials had failed to announce Jewish holiday services. Compl. Ex. H (II), ECF No. 1-1, at 89. He filed an informal complaint alleging that Coffeewood had failed to announce or hold services for the Jewish holiday of

Shavuot, which occurred on May 19–21, 2018. *Id.* In response, Defendant Walker admitted that officials had failed to "post the sign-in sheets and produce a master pass list" for Shavuot. *Id.* He also maintained that this failure was an "oversight" and was "not intentional or deliberate" and that the facility had "taken corrective action" to prevent it from happening again. *Id.*

In July 2018, at Plaintiff's request, prison officials conducted an administrative review of his Good Time Class Level. *See* Defs.' Br. in Supp. Ex. D, ECF No. 63-1, at 33. On this occasion, Plaintiff received a score of 50. *Id.*; Defs.' Br. in Supp. Ex. A, Suppl. Aff. of G. Walker ¶ 18 (Dec. 31, 2019), ECF No. 63-1, at 4–5. Plaintiff's score was thus *lower* than the 70 points he had received during his February 2018 annual review. Prison officials, however, overrode the score to give Plaintiff a score of 70 and to keep him in Class Level II[10] because "a reduction in class level was not warranted." Walker Suppl. Aff. ¶ 18. Plaintiff thus remained at Class Level II, and his projected release date continued to be September 13, 2018. Defs.' Br. in Supp. Ex. D, at 33. On August 22, Plaintiff attended an Institutional Classification Authority Hearing. Defs.' Br. in Supp. Ex. D, at 34. At that hearing, Unit Manager Denise Hillian recommended that Plaintiff be returned to Class Level I. *Id.*; *see* Defs.' Resp. to Mot. for Emergency Immediate Inj. Relief, Aff. of G. Walker ¶ 4 (Aug. 29, 2018), ECF No. 12-2, at 1–2. She explained that Plaintiff had recently completed another program and recommended that he receive another administrative review of his Good Time Class Level to account for this change. Defs.' Br. in Supp. Ex. D, at 34. Defendant Walker denied the request, finding that Plaintiff "did

---

[10] The change in Plaintiff's score between the February and July 2018 calculations appears to be due to the number of points he received in the second category, which accounts for an inmate's completion of educational/vocational goals. Although Plaintiff appears to have received credit for completion of the same two programs on both occasions, he was given more points for them in February than he was given in July. *Compare* Defs.' Br. in Supp. Ex. C, at 31 (showing an initial score of 40–20 points per program–in the "re-entry plan, annual goals" category), *with* Defs.' Br. in Supp. Ex. D, at 33 (showing an initial score of 20–10 points per program–in the same category). Defendant Walker's Affidavit does not explain the reason for this discrepancy, but notes that Plaintiff's "score was overridden and adjusted to a total score of '70' as a reduction in class level was not warranted under OP 830.3." Walker Suppl. Aff. ¶ 18.

not meet the criteria for an administrative review" because he "had a release date scheduled within 60 days, on September 13, 2018." Walker Suppl. Aff. ¶ 19.

### III. Analysis

Plaintiff argues (1) that his good time credit should not have been impacted by his three disciplinary violations because those charges were made in a discriminatory and retaliatory manner, (2) that prison officials should have overridden his score to move him back to Class Level I, (3) that their decision not to do so constituted religious discrimination because they intended that he spend another Jewish holiday in prison, and (4) that their failure to do so is a violation of his due process rights under the Fourteenth Amendment. *See generally* Am. Compl.

Plaintiff brings his remaining claims under 42 U.S.C. § 1983. A § 1983 claim has two basic elements: "[A] plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The facts material to a § 1983 claim will depend on the specific federal right at issue, *see Iqbal v. Ashcroft*, 556 U.S. 662, 677 (2009); *Daniels v. Williams*, 474 U.S. 327, 330 (1986); *Loftus v. Bobzien*, 848 F.3d 278, 285 (4th Cir. 2017), the capacity in which the plaintiff sued the named defendant, *Kentucky v. Graham*, 473 U.S. 159, 165–68 (1985); and, relatedly, the nature of relief sought against that defendant, *Biggs v. Meadows*, 66 F.3d 56, 60–61 (4th Cir. 1995). *See, e.g.*, *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) ("Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief.").

### A.    *Individual Capacity Claims*

Individual capacity claims impose personal liability on the named defendant. *Graham*, 473 U.S. at 165. "[T]o establish personal liability in a § 1983 action, it is enough to show that the

official, acting under color of state law, caused the deprivation of a federal right." *Id.* at 166 (emphasis omitted). Further, "there is no respondeat superior liability in § 1983 actions." *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Thus, a plaintiff must show that "each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

1. *First Amendment Religious Discrimination Claims*

The Free Exercise Clause of the First Amendment guarantees an individual's right to exercise his religion without government interference. U.S. Const. amend. I. To succeed on a Free Exercise claim, Plaintiff must at least show (1) that he holds a sincere religious belief and (2) that a government action has substantially burdened his ability to exercise his religion. *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981). Here, the Defendants do not challenge, and the Court can readily find, the fact that Plaintiff holds a sincere religious belief. *See* Am. Compl. 2. But Plaintiff cannot succeed on his free exercise claims unless he can also show a substantial burden on his religious exercise. A substantial burden exists when a government practice or policy "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (quoting *Thomas*, 450 U.S. at 718). "No substantial burden occurs if the government action merely makes the religious exercise more expensive or difficult or inconvenient, but does not pressure the adherent to violate [his] religious beliefs or abandon one of the precepts of [his] religion." *Rountree v. Clarke*, No. 7:11cv572, 2015 WL 1021286, at *7 (W.D. Va. Mar. 9, 2015) (internal quotation marks omitted).

In the prison context, moreover, courts defer to prison officials, who must make "difficult judgments concerning institutional operations." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Thus,

even "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid

if it is reasonably related to legitimate penological interests." *Id.* In assessing whether a prison

regulation is reasonable, courts consider (1) whether there is a "valid, rational connection"

between the regulation and the legitimate government interest advanced to justify it, (2) whether

other means of exercising the asserted right are available, (3) what impact accommodations

would have on prison officials, other inmates, and prison resources, and (4) the absence or

existence of "obvious, easy alternatives" to the regulation at issue. *Id*. at 90–91. The prisoner-

plaintiff bears the burden to show that the challenged regulation is *not* reasonably related to a

legitimate penological interest. *See Jehoah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015) (citing

*Overton v. Bazzetta*, 539 U.S. 126, 136 (2003)).

      Here, Plaintiff alleges that individual defendants showed animus towards him because of

his religious identity and violated prison policy in a way that impaired his free religious exercise.

He first argues that Defendants Sacra and Walters discriminated against him by charging him

with the three disciplinary violations because of his religious identity. Am. Compl. 6.

Specifically, he claims that Defendant Sacra told him that Sacra knew Plaintiff was Jewish and

informed Plaintiff that Sacra was "atheist or agnostic." *Id.* Further, Defendant Walters revealed

his "bias against Jews" by "greet[ing] Plaintiff along the lines of 'here comes the Jewish lawyer

Haendel to pick up his legal mail.'" *Id.* Plaintiff also alleges that Walters at some point told

"another inmate, 'I don't know anything about Passover, but you can ask the Jew guy over

there.'" Pl.'s Br. in Opp'n to Defs.' Mot. Summ. J. 4, ECF No. 67. In their respective affidavits,

Defendants Sacra and Walters both state that they "do not discriminate against offenders due to

their religious affiliation or for any other reason." Defs.' Br. in Supp., Aff. of R. A. Sacra ¶ 5

(Dec. 27, 2019), ECF No. 63-2, at 2; Defs.' Br. in Supp., Aff. of C. B. Walters ¶ 6 (Dec. 28, 2019), ECF No. 63-3, at 2.

Though statements expressing religious animus may be unprofessional and reprehensible, they do not, without more, constitute a constitutional violation. *Moody v. Grove*, 885 F.2d 865 (4th Cir. 1989) (table) (unpublished) (upholding district court's dismissal of § 1983 claim because "[v]erbal abuse alone does not violate a constitutional right"); *Williams v. Mathena*, No. 7:10cv404, 2010 WL 4226126, at *2 (W.D. Va. Oct. 25, 2010) (plaintiff failed to state a claim because "verbal abuse," alone, did not violate Eighth Amendment); *Matthews v. Beard*, No. 11-221J, 2013 WL 1291288, at *6 (W.D. Pa. Mar. 27, 2013) ("religious and racially discriminatory statements, racial slurs and epithets, without more, [] do not establish liability under § 1983"); *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997) (granting summary judgment to defendants on prisoner plaintiff's religious discrimination claim because verbal abuse "directed at his religious and ethnic background . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983" (cleaned up)), *abrogated on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). Without a doubt, government officials' statements may give rise to a free exercise claim *if* they show that an otherwise neutral and generally applicable government action is tainted by religious animus. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). But here, Plaintiff has produced no evidence to show that Defendants imposed the three disciplinary violations *because* they were biased against him. Plaintiff alleges that Defendant Sacra's comment was made "a few days" *after* Sacra charged him for throwing bread to the birds. Am. Compl. 6. And although Walters's comments may have been made before he charged Plaintiff with two disciplinary violations, Plaintiff does not allege any temporal proximity between the statements and the charges or any other basis from which to

infer that the charges were tainted by religious animus. Am. Compl. 6; Pl.'s Br. in Opp'n to Defs.' Mot. Summ. J. 4 (alleging that Walters's "bias and animosity" was clear from his "previous words addressing [P]laintiff"). While Defendants have introduced affidavits and pointed to prison policy showing that each of the three disciplinary charges were, in fact, violations of existing policy, Sacra Aff. ¶¶ 4–5; Walters Aff. ¶¶ 4–6, Plaintiff has made no more than a bare allegation connecting Defendants' statements to the three charges, Am. Compl. 6; Pl.'s Br. in Opp'n to Defs.' Mot. Summ. J. 4. Accordingly, the Court GRANTS summary judgment for Defendants Sacra and Walters on Plaintiff's claim that religious animus motivated the disciplinary charges filed against him.

Second, Plaintiff alleges that Defendant Walker "overruled Unit Manager Hillian's recommendation to restore Plaintiff's nine days of good time, a blatant act of discrimination against Plaintiff for his Jewish identity with Walker fully aware that his action would result in Plaintiff's confinement during the Jewish New Year, for no reason other than Walker's hatred of Jews." Am. Compl. 11. Here, again, Plaintiff has not produced sufficient evidence to create a genuine dispute of material fact. Although Defendant Walker may have been aware of Plaintiff's religious beliefs, Plaintiff introduced no evidence showing that Walker declined to restore his nine days of good time *because* of those beliefs. By contrast, Walker has produced an affidavit stating that he made his decision in compliance with prison policy and that Plaintiff did not meet the criteria for the recommended administrative hearing because he was set to be released within sixty days. Walker Suppl. Aff. ¶ 19. Even construing the facts in the light most favorable to Plaintiff, I find that Plaintiff has produced no more than "mere speculation," *Dash*, 731 F.3d at 311, to support this claim. Accordingly, the Court GRANTS summary judgment for Defendant Walker on this claim.

Third, Plaintiff alleges that Defendants Gourdine and Gilmore failed to post notice of and hold services for Jewish New Year 2017 and Shavuot 2018, Am. Compl. 8–9. Failures to announce or hold religious services could constitute a substantial burden on a prisoner's free exercise. *See Greenhill v. Clarke*, 944 F.3d 243, 253 (4th Cir. 2019) (prison policy preventing Muslim inmate from attending in-person religious services and from watching televised religious services violated Free Exercise Clause); *Lovelace v. Lee,* 472 F.3d 174, 189 (4th Cir. 2006) (where prison removed plaintiff from its "pass list," after which he was not permitted to fast, attend religious services, or attend group prayers, plaintiff's free exercise was substantially burdened). But here, both Plaintiff and Defendant have produced very little evidence. Although Plaintiff alleges that Defendants acted with discriminatory animus, he has not presented evidence that prison officials' failures to announce/hold religious services were more than occasional and inadvertent. Defendants respond that their actions were at most negligent and, thus, do not amount to an intentional violation of Plaintiff's constitutional rights. But Defendants do not present any evidence to support their contentions. Thus, they have not met their burden as the movants of showing that no material dispute in fact exists. Accordingly, the Court DENIES Defendants' summary judgment motion as to this claim against Defendants Gourdine and Gilmore, and DIRECTS Defendants to file a subsequent summary judgment motion that adequately addresses this claim.

Fourth, Plaintiff alleges that Defendants Gilmore, Gourdine, Butler, and Martin failed to offer kosher food for Passover 2018. Am. Compl. 7–8. Defendants argue that Plaintiff's challenge to the provision of kosher meals is a facial challenge to VDOC policy, that Plaintiff does not allege any of the remaining Defendants were individually responsible for such policy, and that the claim should therefore be dismissed. *See* Defs.' Br. in Supp. 20–21. I disagree.

Plaintiff challenges VDOC policy as applied to him at Coffeewood. He alleges in his verified complaint that Defendant Martin, Coffeewood's Food Service Manager, failed to ensure that meals were prepared in accordance with traditional kosher requirements, Am. Compl. 11–12, that Defendant Gilmore "witnessed many violations" of kosher food requirements at Coffeewood, *id.* at 10, and that Defendant Gourdine was aware of such violations and "failed for over three years to correct the situation," *id.* More specifically, Plaintiff alleges that Coffeewood failed to comply with kosher dietary requirements "because of the contamination of the trays, utensils, food, pots, grill cooking surface, and the mixing of all these items among regular food preparation tools and trays." *Id.* at 8. Here, again, Defendants have not presented any evidence to support their argument. Thus, they have not shown that no genuine dispute of material fact exists. Accordingly, the Court DENIES Defendants' summary judgment motion as to this claim against Defendants Gilmore, Gourdine, Butler, and Martin, and DIRECTS Defendants to file a subsequent summary judgment motion that adequately addresses this claim.

Finally, Plaintiff alleges that Defendants Gilmore, Gourdine, Butler, and Martin improperly confiscated food for Passover donated to Plaintiff by a local synagogue. Am. Compl. 7–8; Defs.' Br. in Supp. 2. Plaintiff alleges, for example, that the donated food was "subjected to a highly unusual search conducted primarily because of Jew-hatred at [Coffeewood]," that the synagogue should have been allowed to deliver the food instead of having to ship it, and that certain defendants "ordered a shakedown of Plaintiff's bed area and property during the screening of said food items." Am. Compl. 7. Defendants correctly point out, Defs.' Br. in Supp. 21–23, that this Court has already addressed this issue in one of Plaintiff's other cases. *See generally Haendel v. Clark*, No. 7:17cv135, 2019 WL 1373656 (W.D. Va. Jan. 22, 2019) (Hoppe, M.J.), *adopted by* 2019 WL 1372166 (W.D. Va. Mar. 26, 2019) (Kiser, J.). But

Defendants rely too heavily on this Court's previous factual findings, arguing that they "are sufficient to support a finding that defendants['] conduct withstands a First Amendment challenge as being reasonably related to penological interests." Defs.' Br. in Supp. 21. This Court declined to find that Defendants' conduct violated a court order addressing this issue under a different standard than is presented in Defendants' motion for summary judgment. Although Defendants may be entitled to summary judgment on this claim under the factors articulated in *Turner*, 482 U.S. at 89–90, Defendants must adhere to the requirements of Rule 56 by at least presenting evidence that they contend is undisputed. Accordingly, the Court DENIES Defendants' summary judgment motion as to this claim against Defendants Gourdine, Gilmore, Butler, and Martin, and DIRECTS Defendants to file a subsequent summary judgment motion that adequately addresses this claim.

2. *First Amendment Retaliation Claims*

Plaintiff alleges First Amendment retaliation claims against Defendants Sacra and Walters. He argues that Sacra and Walters each leveled disciplinary charges against him in retaliation for his filing administrative grievances and an earlier federal lawsuit against multiple Coffeewood prison officials. *See* Am. Compl. 5–7.[11] To succeed on a First Amendment

---

[11] Plaintiff's amended complaint appears to allege that five disciplinary charges were brought against him by prison officials in retaliation for the administrative grievances and the earlier federal lawsuit he filed. *See* Am. Compl. 5–6. Plaintiff alleges specific facts involving Defendants as to three of the charges: (1) one charge by Defendant Sacra for "feeding bread to the birds," *see* Am. Compl. 6; Compl. Ex. A (II), at 3, (2) one charge by Defendant Walters for possessing sugar and mustard packets given to Plaintiff by another inmate, *see* Am. Compl. 6–7; Compl. Ex. A (III), at 13; Compl. Ex. A (IV), at 23, and (3) one charge by Defendant Walters for swearing at Walters and "us[ing] his right middle finger to display the bird" in Walters's direction, Compl. Ex. A (IV), at 23. Plaintiff's amended complaint also makes brief mention of two other charges that he alleges were retaliatory and discriminatory. *See* Am. Compl. 15–16. One charge was for "taking a short cut from the dining hall to the pill window" and the other was for "unauthorized use of a law library computer." *Id.* at 16. Plaintiff's amended complaint says little regarding the "pill window" charge, but the Offense Report indicates that Officer McCann brought the charge for an incident occurring on August 6, 2017. *See* Compl. Ex. A, at 1–2. Plaintiff's amended complaint includes more facts explaining the circumstances surrounding the unauthorized computer use charge. *See* Am. Compl. 6 (explaining that a prison official named "Cooper" charged him with the

retaliation claim, a plaintiff must show: (1) that he "engaged in protected First Amendment activity," (2) that the defendant "took action that adversely affected" him, and (3) that a "causal relationship [exists] between the protected activity and [the] defendant's conduct." *Savoy v. Bishop*, 706 F. App'x 786, 789 (4th Cir. 2017) (citing *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (*Martin I*)).

Here, as Defendants concede, the first element is satisfied. Filing prison grievances and filing lawsuits are both protected First Amendment activities, *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 545 (4th Cir. 2017) (*Booker II*); *Hudspeth v. Figgins*, 584 F.2d 1345, 1347–48 (4th Cir. 2017), and Plaintiff produced ample evidence that he engaged in both activities before or during the relevant time. They do not, however, concede the second element. The Fourth Circuit has held that "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). The filing of a false disciplinary charge against a prisoner could satisfy the second element of a retaliation claim. *Booker v. S.C. Dep't of Corrs.*, 583 F. App'x 43, 44 (4th Cir. 2014) (*Booker I*) (concluding that a false disciplinary charge "would likely deter prisoners of ordinary firmness from exercising their First Amendment rights"). But the filing of a legitimate disciplinary charge does not. *Richardson v. Ray*, 492 F. App'x 395, 396 (4th Cir. 2012) (defendants were entitled to summary judgment because plaintiff failed to provide any evidence that the prison disciplinary

---

violation and that Assistant Warden Hicks may have told Cooper to file the charge in retaliation for "a memo" Plaintiff typed "for Hicks regarding his appeal"). Two of the officers—McCann and Cooper—who brought these two charges are not named as Defendants, and the other officer involved in the unauthorized use charge—Hicks—was previously dismissed from the lawsuit. Moreover, Plaintiff does not allege any facts that would suggest the charges were brought with retaliatory intent. Given the paucity of his allegations, it appears that Plaintiff is not asserting these two charges as part of a claim. In any event, because Plaintiff alleges no facts against Defendants who are presently parties to this action, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's claims of retaliation and discrimination over the pill line and unauthorized computer use charges.

charges against him were false). Plaintiff has not presented any evidence showing that the charges filed against him were false, and "this fact alone dooms [his] claim." *Guinn v. Crumpler*, No. 7:18cv274, 2020 WL 1666301, at *7 (W.D. Va. Apr. 3, 2020). Although Plaintiff alleges that the charges were "unfounded," Am. Compl. 2, and imposed solely to discriminate and/or retaliate against him, *id.* at 5–7, he admits that he was found guilty of the charges, *id.* at 3. Moreover, he has produced no evidence showing that he did not, in fact, commit the offenses charged. *Cf. Booker I*, 583 F. App'x at 44 (plaintiff produced sufficient evidence to survive summary judgment where he was found not guilty of the charged disciplinary offense for lack of evidence, he "specifically refuted" that he "yelled threats" at the defendant, and the defendant's incident report "made no mention of verbal threats or other arguably intimidating conduct"). Plaintiff challenged exhaustively the charges through the prison's appeals process. *See, e.g.*, Compl. Ex. E, at 59, 61; Compl. Ex. A (II), at 5, 8–9, 11; Compl. Ex. A (III), at 22, 62, 64; Compl. Ex. A (IV), at 31–32. But he does not now challenge his guilt. He suggests, for example, that Defendant Walters could not possibly have seen Plaintiff flipping "the 'bird' from a distance of at least some 300 feet," but does not deny his conduct. Pl.'s Br. in Opp'n to Defs.' Mot. Summ. J. 5. And he argues that the bread he purportedly threw and the sugar and mustard packets he allegedly possessed should have been introduced as evidence at his disciplinary hearings, *id.*, but he does not contest that he possessed such items, *id*; Am. Compl. 6–7. He also asserts that feeding the birds and possessing mustard or sugar packets did not violate any regulation, Am. Compl. 5–6, or, if they did, that violations were not enforced, *id.* at 6. He offers no evidence in support of these assertions, however. Defendants, by contrast, have introduced affidavits stating that they charged Plaintiff because he committed the three disciplinary violations, *see* Sacra Aff. ¶¶ 4–5; Walters Aff. ¶¶ 4–6, and other evidence corroborating the

17

circumstances surrounding each of the charges, *see, e.g.*, Defs.' Br. in Supp. Ex. A, ECF No. 63-3, at 8; Defs.' Br. in Supp. Ex. B, ECF No. 63-3, at 23. Because Plaintiff has failed to produce facts necessary to set forth a *prima facie* claim of retaliation, [12] the Court GRANTS summary judgment for Defendants on Plaintiff's retaliation claims against Sacra and Walters.

###### 3. *Fourteenth Amendment Due Process Claims*

"The Fourteenth Amendment prohibits the States from 'depriv[ing] any person of life, liberty, or property without due process of law.'" *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 145 (4th Cir. 2014) (quoting U.S. Const. amend. XIV). "Due process contains both substantive and procedural components," *id.*, and prisoners retain limited rights to invoke

---

[12] Although the Court need not reach the third element, I pause briefly to note that Plaintiff has also failed to show causation. The Fourth Circuit recently clarified its test for causation in prison retaliation cases. *See Martin v. Duffy*, 977 F.3d 294 (4th Cir. 2020) (*Martin II*) (citing *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). Several circuits use a "but for" causation test–requiring plaintiffs to show that "but for" a retaliatory motive, the alleged violation of his rights would not have occurred. *See, e.g.*, *DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019). But because prison inmates "are poorly positioned to collect and present evidence of a prison official's subjective intent," the Fourth Circuit has taken a different approach, opting to split the burden of proof between the parties. *Martin II*, 977 F.3d at 300. If the plaintiff shows that his "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action," the burden shifts to the defendant to show that he had a "permissible basis" for taking the adverse action. *Id.* Here, no burden-shifting is necessary, because, even if Defendants' disciplinary charges were false and therefore constituted adverse action, Plaintiff has failed to make the requisite preliminary showing that his "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action." *Id.* Plaintiffs establishing such a causal link must at least show (1) that the defendant had knowledge of the plaintiff's protected conduct, and (2) that there was temporal proximity between the protected conduct and the adverse action. *See Constantine*, 411 F.3d at 501. Here, Plaintiff has failed to show temporal proximity. The complaint he filed against Defendant Sacra, which he alleges motivated Sacra's decision to charge him for throwing bread to a bird in August 2017, Am. Compl. 6, was filed four months earlier in April 2017, Compl. Ex. E (II), at 65. And Plaintiff's earlier federal lawsuit filed against multiple correctional officials (though notably not against Sacra or Walters) was also filed in April 2017, *see* Compl., *Haendel v. Clark*, 7:17cv135 (W.D. Va. Apr. 5, 2017), months before the August and October 2018 disciplinary charges. A "lengthy time lapse between" the defendant-public official's "becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two." *Constantine*, 411 F.3d at 501. Although a months-long time lapse is not necessarily too long, *see, e.g.*, *id.* (finding a four-month time lapse sufficient to overcome a motion to dismiss), the causal links that Plaintiff seeks to establish here are weak, at best. Plaintiff has not produced sufficient evidence to show that his protected conduct was a "substantial or motivating factor," *Martin II*, 977 F.3d at 300, in either Defendant's decision to charge him with disciplinary violations.

those protections while incarcerated, *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974); *Brown v. Braxton*, 373 F.3d 501, 504–05 (4th Cir. 2004). To proceed on any due process claim, however, a plaintiff "must first demonstrate that [he was] deprived of 'life, liberty, or property,' by governmental action." *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997); *see Prieto v. Clarke*, 780 F.3d 245, 248, 252 (4th Cir. 2015); *Franklin v. Barry*, 909 F. Supp. 21, 28 (D.D.C. 1995) (citing *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 459–61 (1989)). A protected liberty interest can arise either "from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or . . . from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). State-created "interests will be generally limited to freedom from restraint [that], while not exceeding the sentence in such an unexpected manner as to" trigger federal due process protection by its own force, "nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "When determining the baseline for atypicality, a court must consider whether the [challenged] conditions are imposed on a prisoner *because of* his conviction and sentence." *Prieto*, 780 F.3d at 253. "[T]he conditions constituting the 'ordinary incidents of prison life'" for the plaintiff, *id.* (quoting *Sandin*, 515 U.S. at 484), "'will differ depending on a particular inmate's conviction and the nature of nonpunitive confinement routinely imposed on inmates serving comparable sentences,'" *id.* at 254 (quoting *Rezaq v. Nalley*, 677 F.3d 1001, 1012 (10th Cir. 2012)).

Plaintiff raises a Fourteenth Amendment due process claim, alleging that certain individual Defendants intentionally violated VDOC policy regarding the calculation of his Good Time Class Level, causing him to spend an additional nine days in prison. Am. Compl. 3. Defendants previously sought dismissal of this claim under Rule 12(b)(6), arguing that an

official's violation of prison policy does not, on its own, implicate a protected liberty interest. Defs.' Br. in Supp. of Mot. to Dismiss 6, ECF No. 42 (citing *Riccio v. Cty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990)). Although I agreed, I denied their motion to dismiss this claim. *See* Mem. Op. 8, ECF No. 55. Plaintiff had also alleged that officials' intentional breaches of VDOC policy had caused him to "serv[e] nine additional days" in prison, Am. Compl. 1, which *would* implicate a protected liberty interest. Mem. Op. 8, ECF No. 55 (citing *Wolff*, 418 U.S. at 554). Because Plaintiff has failed to support those allegations with admissible evidence, however, I now find summary judgment on this claim appropriate. Plaintiff makes various due process arguments. He alleges that the three disciplinary charges were "unfounded" and should not have counted against him at his good time annual review, Am. Compl. 2, that officials made "errors in arithmetic" when calculating his score, *id.*, that they did not properly respond to his complaints and grievances, *id.* at 3, that Counselor Bracey improperly calculated his score as 50 instead of 70, *id.* at 3–4, that various officials failed to adhere to prison policy, *id.* at 4–5, 7, and that he should have received an override to remain in Good Time Class Level I, *id.* at 5.

Plaintiff's core contention seems to be this: When Counselor Bracey conducted his annual review in February 2018, she found him to have a score of 50. Compl. Ex. B (I), ECF No. 1-1, at 40. She did not itemize the points she awarded. *Id.* Her narrative summary, however, suggests that she likely awarded 10 points in the infractions category (deducting 30 points, in total, for the three disciplinary violations), awarded 20 points in the educational/vocational programs category (for Plaintiff's completion of the "Breaking Barriers" program), and awarded 20 points in the work category (for Plaintiff's work "as a tutor"). *Id.* Counselor Bracey noted that a score of 50 placed Plaintiff in Class Level III and recommended that he receive an override to Class Level II "due to #1 override for points scored being very low and offender stating his

current charges under conviction are currently being appealed." *Id.* As Plaintiff correctly points out, Am. Compl. 4, a "#1 override" is used when "[a] point score in one area of evaluation is inordinately high or low affecting the Class Level." Defs.' Br. in Supp. Ex. A, at 10. Plaintiff also argues that Counselor Bracey mistakenly awarded points for only one program in the second category (when Plaintiff had completed two). Am. Compl. 3. If she had not made that mistake *and* her recommended override was granted, Plaintiff argues, he would have remained in Class Level I and would not have lost nine days of good time. *Id.* at 3–4.

Plaintiff's claim raises at most a possible scoring error, but an official's violation of prison policy does not, on its own, constitute a due process violation. *Riccio*, 907 F.2d at 1469. Moreover, Plaintiff's domino-effect argument is unpersuasive. Even construing the facts in Plaintiff's favor and assuming that Counselor Bracey did made a mistake and would still have recommended an override if she had properly calculated Plaintiff's score to be 70, Plaintiff would not necessarily have remained in Class Level I. The override was merely "recommended" and would have had to have been reviewed and approved by other prison officials. *See* Defs.' Br. in Supp. Ex. B, at 22 (under OP 830.1, an ICA hearing must occur before an inmate's Good Time Class Level is decreased); *id.* at 25 (an ICA's recommendation is subject to review by an "appropriate approving authority" who has the discretion to disapprove or modify the ICA decision); Walker Aff. ¶ 6. Moreover, Plaintiff's assertions that the three disciplinary charges he received were "unfounded," Am. Compl. 2, do not hold water. *See* discussion *supra* Sections III(A)(1) & (2). Defendants have countered with sufficient evidence explaining that Plaintiff received the violations because he committed disciplinary offenses. Sacra Aff. ¶¶ 4–5; Walters Aff. ¶¶ 4–6. Plaintiff has presented no evidence showing that his disciplinary sanctions were improperly scored or that without an override, he belonged in Good Time Class Level I. Thus,

boiled down, his argument is that he should have received a discretionary override from Level II to Level I. Plaintiff cites no authority, and the Court is aware of none, that a due process claim may rest on such facts. Furthermore, Plaintiff has offered no evidence showing that any of the Defendants' actions relating to Plaintiff's good time classification were driven by religious animus. Finding no genuine dispute of material fact, the Court GRANTS summary judgment on Plaintiff's claims related to his Good Time Class Level claims.

B.    *Official Capacity Claims*

Finally, Plaintiff asserts official capacity claims against all Defendants. Am. Compl. 1. Official capacity claims are "suit[s] against the State itself." *Fauconier v. Clarke*, 966 F.3d 265, 279 (4th Cir. 2020) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). Unlike individual capacity claims, which "seek to impose personal liability" on a named defendant for his or her alleged violation of the plaintiff's constitutional rights, official capacity claims "generally represent only another way of pleading an action against" the governmental entity by which the named defendant is employed. *Graham*, 473 U.S. at 165. Thus, although an official capacity claim is asserted against a named individual defendant, the government is the real party in interest. To succeed on an official capacity claim, the plaintiff must (1) show a violation of his rights *and* (2) show that the governmental entity's "policy or custom . . . played a part in the violation of federal law." *Pratt-Miller v. Arthur*, 701 F. App'x 191, 193 (4th Cir. 2017) (citing *Graham*, 473 U.S. at 166).

Defendants are entitled to summary judgment on Plaintiff's official capacity claims. This Court previously dismissed some of Plaintiff's official capacity claims. *See* Mem. Op. 9–11, ECF No. 55. To the extent Plaintiff seeks monetary damages or retrospective injunctive relief against the remaining Defendants in their official capacities, those claims must fail.

"[I]ndividuals sued in their official capacity as state agents cannot be held liable for damages or retrospective injunctive relief. They may [only] be sued for prospective injunctive relief to end violations of federal law and remedy the situation for the future." *Lewis v. Bd. of Educ. of Talbot Cty.*, 262 F. Supp. 2d 608, 612 (D. Md. 2003) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974)). Plaintiff does not appear to raise any remaining official capacity claims for prospective injunctive relief. Am. Compl. 20–21. Thus, his official capacity claims are dismissed.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment, ECF No. 62, will be GRANTED in part and judgment entered in favor of those Defendants. The remaining Defendants are DIRECTED to file a subsequent motion for summary judgment with appropriate supporting evidence as to Plaintiff's First Amendment claims regarding the provision of services for the Jewish holidays, the provision of Kosher for Passover meals, and the confiscation of food donated to Plaintiff for Passover. Plaintiff's official capacity claims will be dismissed without prejudice. A separate Order will enter.

ENTER: November 30, 2020

Joel C. Hoppe
U.S. Magistrate Judge